The next case on our call is agenda number 14, Richard P. Vancura v. Peter Katris, including Kinko, Inc. Give us a moment, counsel. Yes, sir. You may proceed, sir. Thank you, Your Honor. You may please the court. Elliot Shurker on behalf of Kinko's. We are the appellant in this matter. This appeal presents one overarching question. What is the standard of care for an employer whose employees provide notary services to the customers? Where, as here, the employer is not vicariously liable under the Illinois Notary Act as a matter of law. Just a preliminary question. Is there testimony that establishes that Albert, in fact, notarized these documents? I thought his testimony was the exact opposite, that he did not notarize the document. He testified that the signature in the notary section of the document in question was not his own. It was not in his handwriting and would never have signed it as it appears so. My question is, doesn't his testimony even establish that he, in fact, notarized the document? Your Honor, the one thing we will know about what happened at the Kinko's store in Oakland on December 20, 1995, is that we will never know what happened. On page 22 of the appendix, this is what the first district majority said. Albert must have either notarized Vancouver's signature on the mortgage assignment, despite the fact that Vancouver did not personally appear, or he negligently and intentionally permitted someone else to take his notary seal to the Vancouver signature on the mortgage assignment. Under either scenario, he engaged in official misconduct. What Albert said was, I signed the notary certification for boat rights deed. That does not appear to be my signature on the assignment of mortgage. That is correct. That is what he testified. So where is the evidence that establishes that he did? His seal. His seal. The theory, Vancouver's theory, is that either Albert is lying when he said he didn't sign it. And, Your Honor, the two documents are in the record. And the only distinction in the signature, even to a lay person's eye, is that one says Gustavo D. Albert and the other says Gustavo David Albert. And Albert testified, I never used my middle name on anything that I signed. First, in deposition, he actually said, I don't think I signed either one of them. At trial, he said, when I look at the two, I signed this one. But that's got David in the middle, and I didn't sign that one. And also the R looks a little different in Albert. It's a very strange testimony. It's a very strange series of events. And, Your Honor, I can't answer your question as to what happened and how those two documents were notarized, because the only people who would know would be Albert or Brown or Boatright. And Boatright had nothing to say about the notarization of Vancouver's signature. The question, though, is what is Kinko's liability? We were sued, although the First District held. Excuse me. Yes, sir.  The disputed document, it is not a given. No one knows. No one knows. As I said, that's the reason. So there are unresolved factual questions. Unresolved and apparently unresolvable factual questions, Your Honor. As I said, it is a very strange series of events. No one on either side has any definitive answer for it. The bottom line is this. Albert's stamp is on, and he admitted it is his stamp, his seal, is on the assignment of mortgage that has Richard Vancouver's signature on it, although Vancouver wasn't there and didn't sign it. One way or the other, there was something that happened for which the notary is responsible. The question is, what is Kinko's responsibility? The First District majority held. And before you get there, you're starting to say that Vancouver's position is either Albert was lying or you didn't finish it. Or someone's, I'm sorry, Your Honor, you're correct. The two events that the First District majority outlined, either Albert is simply lying and he was in collusion with these folks to help scam Vancouver out of the mortgage proceeds, or Boatwright or someone, Boatwright or Brown, somehow managed to slip another document underneath his seal when he wasn't looking at the counter and sealed it and then somehow was able to artistically forge Albert's signature, although adding the name David instead of the D. So it's one of those two things that must have happened. Or simply that Albert, it's also possible there's a relatively innocent explanation, which Albert doesn't remember. Does the stamp have the name on it? The stamp does have the notary's name on it. That is correct. Does it include the name David? It does not. It says D. Your Honor, I have the documents right here, actually. I can give you the record citations. This is C-03030, which is the release deed signed by Boatwright. Actually, Judge, it just says Gustavo Albert on the stamp. Can I take it back? No D, no David. No D, no David, sir. A number of other documents were introduced at the trial, and he said that the only time I've ever signed David, this is his testimony, I couldn't make this up, is when I became a citizen. I don't use the name David for religious reasons on anything that I sign. That's what Albert said. And as I was saying, if you look at the two documents, this is the Boatwright release deed, which is signed Gustavo D. Albert. Then there's the assignment of mortgage, which Mr. Bencore did not sign, which is signed Gustavo David Albert. And that's literally all anybody knows. If the signing or the not signing of this document is that significant, we would have to find that the trial judge abused his discretion in finding that it was, in fact, Albert who signed and notarized the document? Judge, it matters not to Kinko's liability. It matters not what actually happened, except that Richard Bencore, the critical fact for this court, and these are undisputed, Richard Bencore was not in the store. He did not sign the document. He did not appear before Albert. And either Albert notarized it anyway, or he was either intentionally or negligently involved in someone else slipping his seal on it. Remember, this all happened at once. It all happened in the space of just a very few minutes. Brown went over to the counter. Boatwright made some copies. Boatwright came back. He executed the document. They left, went to the lawyer's office, finished the deal, which, of course, was a scam to cheat Bencore out of the mortgage. So it all happened then, and I say that of some importance because there's a lot of testimony and a lot of findings in the majority opinion about how Kinko's was deficient in training and storage of the seal and log books and all sorts of aspirational goals that notaries might want to do one day. But none of that had anything to do with whatever it was that happened at that moment. The only question now before this court, because as I was saying, the first district held that we are not liable as a matter of law under the INA, the vicarious liability provisions of the INA. The only basis on which the judgment was upheld was a common law claim of negligent training and negligent supervision. Now, I'd like to be clear that our position is not, repeat, is not, that common law claims are preempted by the INA. And that's where I think there's been some misunderstanding of our position on the other side. The most recent decision on this in the Byrd case holds, and we don't disagree, that common law claims are not preempted. The INA imposes no duty to training. It imposes duties on notaries. So the question is whether an employer can be directly negligent based on a purported extra statutory common law duty. And we submit the answer to that question must be no. It must be no for two reasons. First, the standard of care is fixed by the statute under this court's jurisprudence. The standard of care for notaries and notary employers is fixed by the statute. So your position, Mr. Schechter, then, is rather that the Act fixes the measure of the employer's legal duty? That is correct, Your Honor. All right. And secondly, how are we... Well, you can't, the common law duty can't be broader than misconduct that is indicated in the Act, or what would be misconduct under the Act. Yes, Your Honor, and particularly so because the one thing the First District and Kinko's agree on is that there is no statutory duty to train at all, and we voluntarily undertook that duty. So it's really two independent but interrelated reasons. The standard of care is fixed by the statute, and we voluntarily undertook to train under the statute. And you cite Medicare Glaser Corporation in support of your position on that? We cite a number of cases on statutory duty, Your Honor, the Dunn case, the Noyola case, all of which pretty much say the same thing, which is that statutes, and if I'm reading from Noyola, statutes designed to protect human life and property establish the standard of conduct required of a reasonable person. In other words, they fix the measure of the legal duty. Now, there's a real anomaly, we submit, to the First District's decision, that is between the holding on vicarious liability under the INA and the holding that Kinko's negligently trained and negligently supervised Albert. If I might read to the Court from page 42 of the opinion, this is the majority. There is no testimony, no testimony that Kinko's directed, approved, tolerated, encouraged, or expected Albert to engage in misconduct. At page 42 and 45, the majority held, nor was Kinko's aware of any prior misconduct by Albert. That's undisputed. But Kinko's somehow is nonetheless liable for negligently training Albert They are based on the expert testimony presented by the plaintiff, which argues in favor of model notary act standards. Now, as I alluded to a few minutes ago, there are pages and pages of testimony about aspirational goals for storage of notary seals, for maintaining logbooks, none of which are requirements in the INA at all. The INA says nothing about how to store a seal. The INA says nothing about logbooks. What did Kinko's train Albert to do? It trained Albert to keep his seal secure when he wasn't using it. It trained Albert to use a logbook. Those aren't even required by the statute. But as I said, let's put all that to one side, and let's focus on the only possible acts, the only possible acts that gave rise to Vancouver's claim, which is going back to where we started. Either Albert was part of the scam, or Albert either intentionally or negligently somehow allowed someone to do a quick change of the counter and slap his seal on something, and that someone was good enough to write his signature almost exactly as he writes it, except for his middle name. The INA requires, quote, unquote. Could the careless use of the seal result in a liability under the common law? For Kinko's, Your Honor. There is no statutory requirement of any kind with respect to the seal. Right, but I'm talking about the notary. Because remember, the INA doesn't speak to duties of an employer. It only speaks to duties of a notary. And we trained Albert to keep his seal secure. We trained Albert to keep it in the manager's office out of the way of the traffic. The manager's office wasn't always locked. The desk wasn't always locked, but it often was. If a manager was in there, it wasn't locked. This is all Albert's testimony. He would leave his seal and materials in the manager's office. If someone came to the notary desk, he would leave the desk, go get his materials, bring them back, do the notarization, and then bring them back to the manager's office. If he was asked to do a couple of things, make some copies and do a notarization, he would do the notarization first and then put the stuff back and then do the copying. Or if the copies were being notarized, he would do the copying first, then go get his materials and come back. That's what we trained him to do. Somebody used the seal that day. That's possible. Either he did or someone else did. Either he did it intentionally, in which case nobody negligently trained him to do things illegally that violate the statute. If it was negligent, his own negligence, remember, is not imputed to us. This is not vicarious liability. So if he was negligent, that is not imputed to us, we were found not liable as responding at superior basis. And the only way we could be is under the statute. We were found directly negligent on training. If the person that used the seal had picked it up off the desk after it was left there by Aubert, there's an argument I think that could be made that it would be factually covered by the canon law offense. As to Kinko's, Your Honor. As to Kinko's. Because he didn't secure the... I understand exactly. If I might, but that's reasoning from the act of the actual perpetrator back to Kinko's. And that's vicarious liability. We have to start with Kinko's training. If we trained him to keep his seal secure, even beyond the statutory requirements, and he didn't... Beyond the statutory requirements? The statute does not require the seal to be secure. There's nothing in the statute at all about keeping the seal secure. So you're really talking about the voluntary undertaking, right? Exactly. And our liability is... And you can't be liable beyond the scope of the voluntary undertaking. Exactly. That's why you keep saying all we did, all we did in training. I mean, it's a question probably a better place to oppose in counsel is what part of that training would evoke liability. Your position is that if we can only be liable for what we trained on, this is all we trained on, then there's no liability under the voluntary undertaking doctrine. Judge, you've said it much better than I've been trying to. Well, I want you to say it. Like I said, it's better posed for him, but I think I understand your argument on that. The only overlay to that is that we trained... The reasonableness of our training is that it's completely in accord with the statute and the Illinois Secretary of State's notary handbook. But you agree that if the employee would receive improper training under the voluntary undertaking doctrine, that that would increase or would or could increase the risk that they would perform negligence. If we had not trained, Your Honor, Albert to demand the person be present, which would be strange because it's right there in the statute and in the notebook, and so he didn't know that... Suppose he didn't know that Vancouver had to be present. And we voluntarily undertook to train him in accordance with the statute and incompetently trained him so that he actually believed, which he didn't. His testimony is very clear, but I'll answer it as a hypothetical. So he actually believed that he could notarize a signature for someone who was not present? Yes, which is why I said at the beginning, this is not a preemption issue. Just like anyone who voluntarily undertakes, we are liable to the extent of our undertaking. The fact that our undertaking happens to parallel the statute and the Illinois Secretary of State's handbook shows that it was reasonably done. But even absent that, it would be to the extent to which we trained him. And he was trained, this is undisputed, and although there was a bit of a back and forth between the majority and the dissent over manifest way to the evidence and whether Albert's testimony is consistent with the trainer Yamnitz's testimony. Actually, there's no inconsistency at all. We trained Albert to demand identification. Remember that in 1995, the INA did not require a photo ID. It did not require a photo ID. It does now, which of course means it didn't then. The Illinois Secretary of State's handbook said you should get a photo ID. And we told, our trainer told Albert, as he told all the other notaries, you should get a photo ID. He said he always asked for a photo ID, Albert said. Not only that, Albert does something that's not required in the statute at all, perhaps because he got confused with the alternative means of identifying people. He would make the person who gave him the ID swear that it was them, take an oath and swear or affirm that it was actually them. The statute doesn't require that at all. So he was trained not only in accordance with the statute and accordance with the handbook, he was trained beyond those statutory requirements. If whatever it was that happened, either he disregarded his training completely and notarized a signature for someone who wasn't there, or worse, colluded with fraudsters, if you will, neither of which is a negligent training issue. And Chief Justice Fitzgerald, to get back to your question, if he was negligent, he may be liable for violating the notary statute because, of course, notaries may be liable under the statute. Albert settled so his case wasn't tried. But you don't start with the negligent act and then say, therefore, the training was inadequate. Because it's direct liability, not vicarious liability, you start with the training and see if the training was in accordance with our voluntary undertaking and here with the statute. This Court's holding in the Frye case on which we rely is the duty of care to be imposed upon a defendant is limited to the extent of its undertaking. Because the training that we gave was consistent with our undertaking, was consistent with the statute, the only way that the first district majority held that Kinkos could be liable as a matter of common law was by creating extra statutory duties. I think I'm quoting the opinion directly when I say the core of the holding was, in this day and age, you should, you must demand a photo ID. You must do this. You must do that. All of which is aspirational goals from Professor Closen, but is not in the statute. So you start, the first district's analysis starts with imposing an extra statutory duty and then goes backwards and says, because you didn't train on this extra statutory duty that we now impose as a matter of Illinois common law, your training was inadequate. So all that leaves is negligent supervision, which I'll touch on very quickly. I see my time is expiring. We did not voluntarily undertake to supervise. We start with that. We did not voluntarily undertake to supervise. But even if a supervisory duty can be inferred from giving voluntary training or inferred under the INA, we win because there are two elements of negligent supervision. One, that an employer knew or should have known of an employee's, and I'm quoting from Van Horn and Platson, particular unfitness for the position so as to create a danger of harm to third persons. You have to know of the individual employee's particular unfitness. We submit that the majority's findings under the INA are that we had no reason to believe that Albert had ever done anything wrong or would ever do anything wrong. So negligent supervision fails on its elements. Thank you, Your Honor. Thank you. Good morning. May it please the Court. I am Daniel Olswang, and I represent the appellee, Richard Vancouver. Today is a culmination of a case that was filed some 12 years ago and concerns an incident, as counsel alluded to, that happened in December of 1995. Both the trial court and the First District have determined that Kinko's is liable to Richard Vancouver under the common law for its negligent training and supervision of its employee, Gustavo Albert. I think we need to step back and realize or take a look at exactly how this program transpired. This wasn't a situation where Mr. Albert said, I want to become a notary, I want to offer notary services, and so are Kinko's. It was a situation where Kinko's, as a corporation, as a company, made a corporate decision, let's offer the service to our customers, a notary service to our customers. Let's hang a sign in the store that says notaries, and under which notarizations will take place. It also then, besides posting a sign, it established a fee to charge for this service. Mr. Albert, once they rolled out this program, Kinko's absolutely owed a duty to the public, to Mr. Vancouver, to anybody else who came into that store to have a document notarized. And that duty was to protect the public from exactly what happened here, to protect the public from harm that would result from the improper notarization of a signature on a document. Counsel alluded to the seal, the issue of the seal, and I know there will certainly be questions regarding that. They trained Mr. Albert to keep it in a safe place. But first of all, I suppose I should step back and talk about the training in general and the facts that were found, that the trial court found and that the appellate court upheld. The facts were such that they employed some person that worked for Kinko's that was a trainer. He had no experience with notaries. He was not a notary himself. He never notarized a single document, had no idea how to notarize a document. He went and he put together a workbook to be offered to Kinko's employees. In that workbook- Counsel, do you dispute that the Act fixes the measure of the employer's legal duty for notary misconduct? I do, Judge, yes, because this is under the common law. And they undertook to train Mr. Albert and all their other notaries for that matter. And the undertaking was so insufficient and so terrible, which is what was found by the trial court, that that's one of the basis that they were held liable and responsible to Mr. Francois. So your dispute of the first proposition is that regardless of perhaps the Act not encompassing that duty, that there was a voluntary undertaking in this case? Well, I think it was more-yes, I think it was a voluntary undertaking. But I also think we can look to simple respondent superior, which holds an employer liable for its actions of its employees. This was committed within the scope of his employment. Well, let's stick with voluntary undertaking for a minute. What did Kinko's do with respect to the scope of their voluntary undertaking that would allow there to be a duty for- I think you're saying it's a failure to do more, right? Well, they trained him to store his seal in a safe place. If we look at the facts that came out, what did that mean? That mean he kept it-he decided, Mr. Albert testified that he decided leaving it at the counter was not a good place. Okay, so he thought, okay, I'll put it in the manager's office. The manager's office is locked sometimes. It's a store that's open 24 hours. There's a manager on duty, I think the testimony was between 8 and 12 hours a day. And when the manager was on duty, it was not locked, which means any employee of Kinko's could go into that office, go into that manager's desk, take that seal, and notarize the document. It's a scary proposition. I mean, how do we know that it wasn't another employee of Kinko's had notarized this document that happened to her in? So is your proposition that they should have further defined what a safe place is? Yes, and that's the testimony that came out from Professor Closen, who is an expert, and this is-he spent his life dealing with the Notary Act and notary law and explaining that. And it's not-his testimony aided the trial court in handling of the common law claims. He's not-he can't testify to what the statute says, but when the court looked at a termination of what actions were reasonable by Kinko's, they looked at Professor Closen and his testimony. And his testimony was such that it's not just okay to say store it in a safe place, which really wasn't that safe because it was an office that anybody can access. And there's even testimony at trial that not only could other employees access it, but potentially the public could access it. They were trained to say don't go back there, don't go to the manager's office. But that's not to say that someone from the public couldn't go back there and just help themselves to the seal. I know it's a little-it's a little reaching, but nonetheless, it's a scary proposition that Mr. Allbear's seal could be used at any time. He didn't work 24 hours a day. When the hours he was there, he wasn't there. There were certainly hours that anybody could use the seal. He didn't know was it locked, was it unlocked, what's the status of the seal. Anybody could have used it. So I think that they absolutely had a right to the protection of the public to make sure that that seal was kept in a safe place. I mean, it wasn't like Mr. Allbear wanted to become a notary. It wasn't like-I'm sorry, not wanted, but it wasn't like he was doing it on the weekends or he took a seal home with him. This was at the direction of Kinko's. It further set-in furtherance of their creation of this decision to employ-to have notary services offered at its stores. This wasn't-this was all-not to-but Mr. Allbear was a pawn, basically. He was there to notarize the documents for his employer. It would serve no other purpose, that seal. And what's even more scary is when he left, he gave Kinko's the seal. He didn't take it with him. It's his personal property. He didn't take it with him. Anything could have happened after that, that they had his seal and that notarization to Mr. Allbear could have taken place for years afterwards. He never would have known the difference. That's not very good training either, to say that it's okay, we'll just take your seal back. He should have taken that seal back. He should have been instructed to take that seal with him when he left employment, and he didn't. And it sat at the Kinko's stores, and who knows what happened with that seal. Going back a little bit to the trainer himself and how faulty this training was, the trainer, Mr. Yamditz, as I said, was never a notary himself. He worked through a-worked up a handbook. He did not consult an attorney when he developed the training program. His testimony was that he sent a copy to the corporate office for review. He never received a response. He even requested that Kinko's allow him to take a notary training class due to his doubt, and I quote, doubt about his self-instruction, which was denied because the expense was $300 or $400, which Kinko's refused to pay. Counsel, do you agree that it's the plaintiff's burden to prove the negligent training? Yes, and I think that the facts that came out at trial were overwhelmingly supportive. The trial court and the appellate court overwhelmingly supported the claim that Kinko's was negligent in its training of Mr. Albert. So it's not the defendant's burden to prove it was sufficient. It's your burden to prove it was insufficient. Well, I suppose to counter our argument that it was insufficient, it would be their burden to show how it was sufficient, but- And you agree that it has to be-it has to be-would have to be in the act in order for that to happen? In order for them to be held responsible for that? In the act, I'm sorry, I don't know what- In the notary act? No, I don't think it's-no, because we're seeking the- So where does this duty or responsibility come from as to the elements? Well, I think the duty comes from common law in and of itself, this theory that an employer can be liable for its employees' actions when it's within the scope of their employment, and there's case law going back in the state of Illinois to the 1850s, I think. How does that fit in with the voluntary undertaking doctrine? Well, I suppose- Is it in addition, or is it part of it, or- I think it all goes together is what I think, that- Well, under voluntary undertaking, you're only responsible to the level of your-of the undertaking, not the onus. Well, I agree. I mean, the undertaking here, it's our position, was so insufficient, and, you know, that the actions were within the scope of employment, that, you know, being as insufficient as it was based on the testimony of Professor Closen, who certainly aided the trial court in coming to the conclusion that just- their undertaking alone was enough to impugn liability. I think you can go further and argue that, you know, this negligence theory that, you know, he acted within the scope of his employment. They manipulated, they controlled this whole program. This was very-Mr. Allbear didn't have a whole lot, you know, outside of offering the service at Kinko's. They paid for it. They had him do this. I'm sure they had others as well. And it was just so, you know, manipulated on the part of Kinko's. And so they owe the duty to make sure that its notaries knew exactly what they were doing when they- Would they be responsible if they didn't provide any training? I think they had to provide training in the sense that, you know, it wasn't- Were they legally required to provide training? Well, I think what-I think they had a duty in that when you look at this, again, going back to this corporate decision to offer notaries, it would be completely negligent on their part just to say go ahead and start notarizing documents. Under our sign that says notaries, under us charging a fee, and we're collecting the fee, not the notary collecting the fee, it was Kinko's that was collecting the fee, to not provide some sort of training to him. I mean, this was a conscious decision that they made to move forward with this program. It wasn't- So regardless-I really want to understand your argument here. So regardless of whether they provided any training, the fact that they had this fellow who was an employee notarizing documents on their premises would be the basis for liability against the principal? Well, I think it would be the basis for a negligent theory that, you know, employer-employee relationship, that he was acting, you know, within the scope of his employment, that looking at a standard of reasonableness, and the reasonableness of his actions and the reasonableness of just throwing a notary out there and saying, okay, go ahead and notarize documents. They may not know what you're doing, but go ahead and do it anyhow. It's kind of a scary proposition. I mean, you know, certainly the loss of- You have a fundamental problem with that duty is based on what the act says duty is. Even for purposes of the common law. That's your fundamental problem, isn't it? Well, I don't think so, because I think under the common law theory, we look at a standard of reasonableness. And this standard of reasonableness, what would someone who undertook to train, what would they have reasonably done in this training? You know, Mr. Allbear testified that his training was to rely on one form of identification, not to confirm the identity of the person appearing before him, but to confirm that the signature on the identification document matched the document he was notarizing. There was no photo. There was no description of the person. I mean, that means I could have come in with an ID that just signs, you know, any name on there, go have him notarize that document and sign that same name on there, and that would have been enough. Under any theory, that was not enough. A reasonableness would have amounted to looking at a photo ID and saying, is this you making sure it's that person before you, and not just any old ID that has a signature on it, and then comparing it to documents and saying, okay, notarize. But in any event, even if he didn't notarize it as his testimony kind of alluded to or he was confused about, someone did. And whether it was another employee at Kinko's or whether it was Mr. Boatwright or Mr. Brown or one of the other people there, it still goes to the fact that the training with regard to where to keep the seal, I don't think it was to keep it on the counter. I don't think it was to keep it behind the counter. It should have been locked up in a manager's drawer and locked at all times, not where anybody can use it, where any employee could have gone to take it and notarized this document in particular. Counsel, could you kind of help me correct my thinking at this time? It just seems to me that if we were to uphold the appellate court's approach on the voluntary undertaking doctrine, we would be stretching beyond its normal application, that doctrine, so that one who voluntarily undertakes to train an employee is all but automatically liable if the employee simply disregards the training. Am I wrong? Well, I don't think that what happened here is he simply disregarded the training. I think that the ample facts, conclusions that the definer of the trier. You're pushing this beyond its normal application. Well, but the voluntary undertaking, but what I don't think is that yes, the duty is to the extent of the undertaking, but the undertaking was so deficient here is I think what. You're pushing it beyond its normal application. But I don't understand how so, because if you undertook to do something and did such a deficient job of doing it, that's not pushing it beyond its normal application. That's saying that you were just so deficient, which is what the trier and the appellate court found that ample evidence of how deficient this training and supervision was. In fact, there was no supervision, not at all in this case. There was no supervision of Mr. Allbear. The managers at the stores did not know, and his testimony was, they did not know what a proper notarization was. They didn't have any idea if Mr. Allbear was doing a notarization or any of the notaries were doing it right. They just kind of gave this deficient training and said, okay, go ahead and, you know, notarize documents and charge a fee for it. And so I don't think, I think what happened here is just the lack of training in Mr. Allbear. And there's just so much that was found by the trier of facts as to why it was deficient and the appellate court that it just was so lacking in this training and the supervision that they had no choice but to find them negligent for their training and supervision of Mr. Allbear. Counsel, I'm trying to understand your position, really, to follow up on your answers to Justice Garmon and also now to Justice Freeman. Is your position that there is a duty imposed above and beyond the duty that's in the statute itself? And, again, is that based on the reasoning the appellate court has used? Is that your position? Well, I think counsel and the appellate uses this language that it created an extra statutory duty. But I don't think that's correct. I think the duty is, when you look to just a reasonable duty, a reasonableness of what we're. . . Well, let's back up. Okay. The statute, as I read it, says in terms of employer liability, and I think it's Section 7-102, that there has to be the employer had to consent in the notary public's official's misconduct. Yes. Are you saying there's a duty that does or does not exceed that requirement to show that the employer consented in the misconduct? I'm saying it's a different burden that we're looking at under the common law. Okay. Well, if it's a different burden, what is that duty and where does that duty arise? Well, I think it arises from a standard theory of employer-employee liability. It arises from a, under a negligence theory. And what would have been reasonable for this training that Kinko's did? What would have been reasonable that the training they provided to their notary? What would have been reasonable as far as supervising? Or what would have been reasonable as far as the seal was concerned? Well, if it's something other than the consent as is imposed under the statute, it is extra statutory. Well, but I think we can look outside of the statute. The statute is, yes, it defines this theory of consent or this idea of consent. And there's been nothing that's interpreted that, I don't think. The legislature certainly didn't interpret, didn't give us some guidance as to what consent means. It doesn't mean they have to stand over him and say, you know, that's obviously a forged signature. Go ahead and sign it. I don't know, and I don't purport to know. But I think it's, the duty is just, arises given the program, given the fact that they put this program into place, given the protection of the public in general by offering such a service, that what would have been reasonable? And what would have been, what should the notary have done to secure things like this don't happen? To ensure that, you know, people don't lose their property, people don't lose money. I mean, people come in all the time and notarize documents, whether it's to withdraw money from an IRO or whether it's an assignment of mortgage, like in this case. There has to be some sort of responsibility for, you know, when you train a notary to not take a photo ID. Let his seal be in a place where anybody can use that seal. I see your time's running out. Yes. And there's been some merger of the terms negligent training and negligent supervision. So my question is specifically with respect to the supervision argument. Did Vancouver ever establish that Kinko's was aware of any particular unfitness on Elberis Park? I don't believe so, Your Honor. So I'm trying to understand where we would have a negligent supervision case, because without Kinko's being aware of unfitness, can there be an allegation that they failed to protect some third party against this particular unfitness and thereby approximately caused Vancouver's injury in this case? Well, I'm not sure that I'm sold on the Van Horn case being applicable to this case. The Van Horn case seemed to was predicated upon speech protected under the First Amendment and more along the lines of negligent, toward negligent hiring and retention of an unfit employee. I'm not sure that that case, the applicability of it is appropriate in this case. May I just, final thought? You have one final thought. Thank you. Thank you, Your Honor. Again, I would like to thank you, thank the court for letting me advocate my client's position. It's certainly been an honor and a privilege to appear before you. The judgment against Kinko's for negligent training and supervision is consistent with the findings of fact made by the trial judge, clearly not manifestly erroneous as the appellate would have this court believe. Kinko's had a duty to protect the public against harm in order to prevent the exact situation that happened in this case. I therefore ask the court, on behalf of Richard Vancouver, to affirm the trial court's judgment and affirm the First District's holding that the manifest way to the evidence support the trial judge's conclusion that Kinko's training and supervision of their notary was negligent. Thank you. If it pleases the court, Kinko's was not on trial for the victimless crime of having a bad training program. We were on trial for a negligent act that injured Vancouver. And if I could go back to the First District Majority's words, there is no evidence that Kinko's directed, approved, tolerated, encouraged, or expected Albert to engage in misconduct. Professor Closen did not like our training program. I think everyone in the courtroom is aware of that. And I believe I heard opposing counsel refer to our training in general as being so deficient. But let's go back again to where I started in my argument, which is the First District's characterization of what happened in the store on the day of the incident. It didn't involve somebody sneaking back into the manager's office at some other time and grabbing hold of Albert's seal or doing anything like that. This is what the First District concluded the record showed. Albert must have either notarized Vancouver's signature on the mortgage assignment, despite the fact that Vancouver did not personally appear before the notary public. There is no dispute in this record that poor, abused Mr. Yamnitz trained Albert to require that the person appear before him. Yamnitz testified that he did. Albert testified that he did. There is no question that our training program was sufficient on the statutory requirement that the person whose signature is to be notarized appear before the notary. So if Scenario 1 happened, Albert simply disregarded everything, the most basic thing that he was taught in his Kinko's notary class. Second possibility. Albert negligently or intentionally permitted Boatwright's business partner, that's Brown, to apply Albert's notary seal to Vancouver's signature on the mortgage assignment. If he intentionally allowed his seal to be used to do something that involved notarizing the signature of someone who was not before him, he violated everything he was taught in Kinko's notary class. So the only theory on which my opponent could possibly go forward on direct negligence against Kinko's is the possibility that Albert negligently allowed his seal to be used by another. He was trained, unquestionably, to bring his seal to the counter, to do the notarization, and to put it back. He wasn't trained to leave it lying around. He wasn't trained to leave it where anyone could grab it. That was not his training. His training was to keep it secure. If he slipped up, if that's what really happened, was simply a slip-up by Albert at the time of the notarization, not when it was in the manager's office, not when it was stored anyplace else, not in the middle of the night when he wasn't even there, but at that moment, he was negligent. The question is, what in our training failed to teach him? Because otherwise, you do what essentially my opponent is saying. You make us the guarantor of our notaries at a dollar a notarization for the entire world for anything that happens, any slip-up by a notary, any intentional misconduct by a notary, any type of negligence, any disregard of training, you then reason backwards to say that Kinko's must have therefore been negligent, and that is not the definition of negligent training. Now, what was it that Yamnitz said that he taught Albert to do? Referring again to the majority opinion's characterization of his testimony, at page 19 of the majority opinion, Yamnitz taught his students to ask for a state identification card, driver's license, or other card that had a photo, the person's height and weight, and the person's signature for comparison with the signature on the document. Yamnitz taught his students to rely on one form of identification, but if they were suspicious, they could ask for a second one. What does the Secretary of State's notary handbook state? It's in the record. A notary has satisfactory evidence if the person is personally known to the notary, is identified by a credible witness, or is identified on the basis of identification documents. Proper identification should include a photograph and a signature on a reliable identification card, such as a driver's license. Yamnitz, for all the criticism that he gets in the first district majority opinion and from my opponent, taught Albert to do exactly what the Secretary of State handbook says he should do, and Albert testified that he was taught to do exactly what the Secretary of State's handbook said to do. The act that injured Vancouver, whatever it was, had nothing to do with the logbook, it had nothing to do with how the seal was kept, and suspicions about people sneaking back in the dead of night to get the document notarized in Albert's absence simply have no basis in this record because we know from the testimony of a disinterested witness, that's Mr. Parker due to closing, that they went to the Kinko store and came back with the two documents notarized. They both happened at the same time. We know that from his testimony, and even if we disbelieve Boatright, who said that's what happened as well. So whatever happened, happened at the notary desk, at that moment, and all the possibilities are identified in the first district's opinion. We submit that if you listen to opposing counsel, that the standard is quote-unquote reasonableness. No business could ever design a notary training program that would satisfy this amorphous reasonableness standard because what that standard means is that anything that goes wrong is the trainer's responsibility. And not only that, we understand now from our opponent that there's some nebulous obligation to train in the first instance that doesn't appear anywhere in the statute, which would obliterate the voluntary undertaking doctrine and make every employer of a notary liable for anything that might go wrong. As we argue to the court in our petition for leave to appeal, there are 183,000 notaries at last count in the state of Illinois, many of whom are engaged with businesses like Kinko's that charge a dollar for a notarization. Sure, it's a loss leader, but it's also a public service for people that don't have access to lawyers for simple transactions or don't want to pay lawyers for simple transactions. Notaries, if an employer is going to be liable under Mr. VanCore's quote-unquote reasonableness standard, it would be impossible to design a training program. So one of two things would happen. Either there'd be no training, an employer might decide, well, the statute doesn't require me to train at all, and they could tell an employee, go get a notary license and come on back to the store and it's not my problem, it's up to you to do it right, or more likely, as a protection would have, would terminate notarial services. Basic bedrock principles of common law govern the disposition of this case. The duty is fixed by the statute, and one is only liable on a voluntary undertaking for the extent of the undertaking. We submit the first district's decision should be reversed. Kinko should not be liable on any theory. Thank you. Thank you, counsel.